J-A30021-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.T., BIOLOGICAL MOTHER | No. 1484 EDA 2014 |

Appeal from the Order and Decree April 15, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000653-2013
CP-51-DP-0065485-2009
FID: 51-FN-339253-2009

BEFORE:  LAZARUS, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY MUNDY, J.:                **FILED JANUARY 30, 2015**

Appellant, R.T. (Mother), appeals from the April 15, 2014 decree involuntarily terminating her parental rights to her son, M.T., and the April 15, 2014 order changing the permanency goal to adoption.[1]  After careful review, we affirm.

The relevant factual and procedural history, as gleaned from the certified record, follows.  M.T. was born in March 2009, at which time he and Mother tested positive for cocaine.  N.T., 4/15/14, at 3.  In July 2009 when M.T. was four months old, he was placed in the custody of the Philadelphia

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court entered a separate decree on April 15, 2014, involuntarily terminating the parental rights of M.T.'s unknown father.

Department of Human Services, Children and Youth Division (DHS). *Id.* at 4. On November 15, 2013, DHS filed a petition for a goal change to adoption. On November 20, 2013, DHS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). A hearing was held on the petitions on April 15, 2014, during which DHS presented the testimony of its caseworker, Ebony Boyd; William Russell, Ph.D., who performed a parenting capacity evaluation; and Rachel Spalding, a social worker at Bethanna foster care agency. In addition, Mother testified on her own behalf.

On April 15, 2014, the trial court entered a decree involuntarily terminating Mother's parental rights. By separate order also dated April 15, 2014, the court changed M.T.'s permanency goal to adoption. On May 14, 2014, Mother timely filed a notice of appeal from the April 15, 2014 decree and order, as well as a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). On June 16, 2014, the trial court filed its Rule 1925(a) opinion.

On appeal, Mother presents the following issue for our review.

> Whether the [trial] court erred in terminating Mother's parental rights and in changing the FSP goal to adoption where Mother completed her FSP objectives and the evidence was not clear and convincing in support of terminating Mother's parental rights?

- 2 -

J-A30021-14

Mother's Brief at 4.[2]

We review the decree involuntarily terminating Mother's parental rights to M.T. according to the following standard of review.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id***.; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 ([Pa.] 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest

---

[2] Mother's argument on appeal is confined to the April 15, 2014 decree involuntarily terminating her rights to M.T. In her brief, Mother fails to develop any argument concerning the goal change with discussion and citation to the statute and case law. Thus, to the extent Mother attempts to advance a challenge to the order changing the goal to adoption, we find said issue waived. We have stated, "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." ***Lackner v. Glosser***, 892 A.2d 21, 29-30 (Pa. Super. 2006) (citations omitted). ***See also In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (holding that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived[]"), *appeal denied*, ***W.H. v. L.B.***, 24 A.3d 364 (Pa. 2011).

unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [*supra*]. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012) (parallel citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of

- 4 -

best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted), *citing* 23 Pa.C.S.A. § 2511. The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we conclude the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.

### § 2511. Grounds for involuntary termination

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary

consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b); **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements.

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination [of parental rights under Section 2511(a)(2)] due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. To the contrary, those grounds may

include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues the trial court abused its discretion in terminating her parental rights because she completed her Family Service Plan (FSP) objectives. Mother's Brief at 11. Further, Mother asserts the trial court erred by relying on evidence not of record. *Id.* Specifically, Mother argues the trial court set forth factual findings in its Rule 1925(a) opinion that were alleged by DHS in its petition for the involuntary termination of Mother's parental rights, but not made a part of the record. *Id.* at 13. Upon careful review, we reject Mother's claims.

Ebony Boyd, the DHS caseworker, testified that DHS established the following initial FSP goals for Mother: to participate in a drug and alcohol evaluation, a mental health evaluation, parenting education, visitation with M.T., and any recommended drug and alcohol and mental health treatment. N.T. 4/15/14, at 4. DHS subsequently added FSP goals for Mother to participate in M.T.'s mental health treatment and in M.T.'s Individual Service Plan (ISP) goals.[3] *Id.* at 5.

It is undisputed that Mother complied with her FSP goals to participate in parenting education, drug and alcohol treatment, and supervised visitation.[4] *Id.* at 5-7. Indeed, the testimony reveals that Mother has been clean and sober for approximately three or four years. *Id.* at 28. Nevertheless, Boyd testified that, although she requested Mother's participation in M.T.'s mental health therapy and treatment, Mother has failed to participate. *Id.* at 7-9. Further, Boyd testified that, to her knowledge, Mother has not participated in M.T.'s ISP goals. *Id.* at 9-10.

_____

[3] The record reveals that M.T. was diagnosed with Attention Deficit Hyperactive Disorder in late 2012. N.T., 4/15/14, at 7. M.T. also suffers from anxiety. *Id.* at 20. Boyd testified that, when M.T. becomes anxious, he "starts to bite the skin off his fingers[,] and he bites his nails down until they bleed." *Id.* at 20. M.T. receives weekly individual therapy. *Id.* at 19. Further, he takes prescribed medication for his mental health problems. *Id.*

[4] Notably, with respect to Mother's visits with M.T., Boyd testified that, in March 2011, they progressed from supervised to unsupervised visits in the community. N.T., 4/15/14, at 12. However, in May 2013, the visits became supervised based on an allegation by M.T. that Mother had punched him in the stomach, in the arm, and in the leg. *Id.* at 12, 14. DHS substantiated M.T.'s allegation based only on his report. *Id.* at 22-23. The visits have remained supervised ever since.

Boyd testified with respect to whether Mother understands M.T.'s mental health issues as follows.

> Q. Do you think that [Mother] has an understanding about [M.T.'s] issues currently if reunification or even unsupervised visits were to occur?
>
> A. No … Because even if you try to talk to her about past issues with [M.T.] acting out which led to him being tested, being evaluated, and going into treatment, she still really doesn't want to address it. She just wants to say those are issues that happened in the past and she's just moving forward.
>
> …
>
> Q. And does this concern you, as the DHS social worker, when we're talking about reunification or even unsupervised visits?
>
> A. Yes.
>
> Q. Why is it?
>
> …
>
> A. Because in order for [M.T.] to return to [Mother's] care she's go[ing to] have to understand that [M.T. is] go[ing to] continue to have issues even if he's reunified because he's been in placement so long, and he's going to continue to have behavioral concerns that are go[ing to] need to be addressed, and she has to understand how to address it, how to help him address the issues, and how to address the issues herself.

*Id.* at 8-9. Finally, Boyd testified that Mother has not complied with the FSP goal regarding her own mental health treatment in that she was most recently attending therapy on a monthly basis only, rather than on a weekly basis, as her goal required. *Id.* at 10-11.

William Russell, Ph.D., the director of the psychiatric outpatient clinic, Assessment and Treatment Alternatives (ATA), testified that he performed a parenting capacity evaluation on Mother in January 2014 and concluded that Mother is not "up to the challenge of providing for [the] safety or permanency of [M.T.]." *Id.* at 39. Dr. Russell testified that Mother had mental health issues including, but not limited to, "long-standing substance abuse history which is in remission. … Her ongoing self-reported problems with sleep and feeling depressed." *Id.* at 35. Dr. Russell testified that Mother "reported receiving medication for attention deficit disorder," and that she reported receiving medication for her sleep problem. *Id.* However, he testified that Mother reported "a significant problem remembering to take her medication." *Id.* at 36.

Moreover, Dr. Russell testified that the medications Mother reported taking, Adderall and Alprazolam, an amphetamine and benzodiazepine, are highly addictive and "extremely concerning for anyone with substance history…." *Id.* at 41-42. He also testified that Mother reported the prescriptions direct her to take the medications as needed, and he testified "[t]here are a whole host of issues that could crop up from the intermingling of those two medications on an as-needed basis." *Id.* at 42. For instance, Dr. Russell described potential problems including "you could go into a period of stupor, [ ] you could go into a blackout, [ ] you could hit a period of sort of psycho motor retardation and fall asleep[.]" *Id.* at 42. Dr. Russell

testified that Mother's self-reported sleep problems are a "very common side effect of flipping amphetamines and benzodiazepine[]s[.]" *Id.* at 43.

Based on the foregoing testimonial evidence, we conclude that DHS produced clear and convincing evidence that Mother's repeated and continued incapacity has caused M.T. to be without essential parental care, control or subsistence necessary for his physical or mental well-being for the entire five years of his life. Further, the causes of Mother's incapacity cannot or will not be remedied. Therefore, Mother's issue on appeal fails.

In light of the requisite bifurcated analysis regarding the involuntary termination of parental rights, we next review the decree pursuant to Section 2511(b). With respect to the relevant bond analysis, our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to

their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." ***Id.***

Instantly, Boyd testified as follows, regarding the fact that M.T. has lived with the same foster parents since placement, and that they are a pre-adoptive resource. ***Id.*** at 17.

> Q. [ ] [D]o you believe [M.T.] would suffer any irreparable harm if mother's parental rights are involuntarily terminated?
>
> A. No, I don't, because I believe he's getting what he needs with his foster parents. He's very, very bonded to them. They're making sure that his needs are met. They make sure that he's attending his therapy, he's receiving his medications like he's supposed to. So, I don't think that there would be any irreparable damage if he remains with his foster parents, I don't.

***Id.*** at 17-18. In addition, Boyd, who visits M.T. monthly, at minimum, testified he becomes anxious and upset upon the mere mention of Mother. ***Id.*** at 14. Specifically, she noted that "just the mention of his mother [M.T.] starts to bite the skin off his fingers, he starts to bite his nails and he gets this anxiety and he gets so upset just in mentioning her." ***Id.***

Likewise, Rachel Spalding, a social worker at Bethanna foster care agency who supervises Mother's visits with M.T., testified as follows.

> Q. Do you believe [M.T.] would be harmed, irreparably harmed, if mother's rights were terminated today?
>
> A. No.
>
> Q. Why is that?

- 12 -

> A. I do not see that [M.T.] has a bond with his mother. He's never, as I stated, had any problems separating from her, but does show a great amount of distress when being separated from the foster parents.

*Id.* at 70. Further, Spalding testified she believes that M.T. would be harmed if he was separated from his foster parents. *Id.* In light of the testimony of Boyd and Spalding, we conclude that terminating Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of M.T. pursuant to Section 2511(b).

Based on the foregoing, we conclude the trial court did not abuse its discretion when it involuntarily terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b). *See S.P.*, *supra*. Accordingly, we affirm the trial court's April 15, 2014 order and decree.

Order affirmed. Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2015

- 13 -